IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. FMRI, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. <u>21-CV-102-SPS</u> |
| | ) | |
| 1. MUSKOGEE CITY-COUNTY PORT AUTHORITY; | ) | No Related Case |
| 2. NATHANIEL E. OPARA D/B/A AFAM, INC.; | ) | |
| 3. AMALGAMATED METAL CORPORATION PLC; | ) | |
| 4. AMALGAMET, INC.; | ) | |
| 5. JX NIPPON MINING & METALS CORPORATION; | ) | |
| 6. METALLON HOLDINGS CORP. F/K/A ASSOCIATED METALS & MINERALS CORP.; | ) | |
| 7. ASSOCIATED METALS & MINERALS EXPORT CORPORATION; | ) | |
| 8. THE MENO LISSAUER FOUNDATION, INC. F/K/A ASSOCIATED METALS & MINERALS FOUNDATION INC.; | ) | |
| 9. ASSOCIATED METALS & MINERALS TRADE CO., INC.; | ) | |
| 10. ASSOCIATED METALS WESTERN HEMISPHERE CORPORATION; | ) | |
| 11. BHP MINERALS SERVICE COMPANY F/K/A BILLITON TRADING COMPANY, INC. AND F/K/A BILLITON METALS, INC.; | ) | |
| 12. BOMAR RESOURCES INC. NV; | ) | |
| 13. BRANDEIS, GOLDSCHMIDT & CO., INC.; | ) | |
| 14. CABOT CORPORATION; | ) | |
| 15. GLOBAL ADVANCED METALS USA, INC.; | ) | |
| 16. CHI MEI METALS CORPORATION; | ) | |
| 17. ELDERS RAW MATERIALS LIMITED; | ) | |
| 18. FINAMINES, S.A.; | ) | |
| 19. AMG ADVANCED METALLURGICAL GROUP N.V.; | ) | |
| 20. METALLURG, INC.; | ) | |
| 21. UNITED STATES GENERAL SERVICES ADMINISTRATION; | ) | |
| 22. HOWARD S. GABLE; | ) | |
| 23. OSRAM SYLVANIA INC.; | ) | |

24. KENNAMETAL, INC.;                                        )
25. LEWIS & PEAT (METALS), INC. F/K/A                        )
LEWIS & PEAT SERVICES, INC.;                                 )
26. LI TUNGSTEN CORPORATION;                                 )
27. PHILIPS NORTH AMERICA LLC;                               )
28. METALS MARKETING AUSTRALASIA PTY.                        )
LTD.;                                                        )
29. NATIONAL RESOURCES TRADING INC.;                         )
30. O'DELL CONSTRUCTION COMPANY, INC.;                       )
31. PHILBRO LLC;                                             )
32. SAMINCORP, INC. A/K/A COLUMBIAN                          )
ENTERPRISES, INC.;                                           )
33. SASSOON METALS & CHEMICALS, INC.                         )
A/K/A SASSOON METALS & CHEMICALS USA,                        )
INC.;                                                        )
34. TRAXYS NORTH AMERICA LLC;                                )
35. EVERZINC USA, INC.;                                      )
36. EDWARD TELUCKY;                                          )
37. THAISARCO A/K/A THAILAND SMELTING                        )
& REFINING CO., LTD.;                                        )
38. VALENITE, LLC; and                                       )
39. VERNON E. STRATTON,                                      )
                                                             )
            Defendants.                                      )
                                                             )
_____/

## COMPLAINT

Plaintiff, FMRI, Inc., on its own behalf and as successor and assignee of Fansteel, Inc. (hereinafter, "FMRI" or "Plaintiff"), by and through its counsel, Clark Hill PLC, and for its Complaint against Defendant, Muskogee City-County Port Authority (the "Owner Defendant"); and Defendants Nathaniel E. Opara d/b/a AFAM, Inc.; Amalgamated Metal Corporation PLC; Amalgamet, Inc.; JX Nippon Mining & Metals Corporation; Metallon Holdings Corp. f/k/a Associated Metals & Minerals Corp.; Associated Metals & Minerals Export Corporation; The Meno Lissauer Foundation, Inc. f/k/a Associated Metals & Minerals Foundation Inc.; Associated Metals & Minerals Trade Co., Inc.; Associated Metals Western Hemisphere Corporation; BHP Minerals Service Company f/k/a Billiton Trading Company, Inc. and f/k/a Billiton Metals, Inc.;

Bomar Resources Inc. NV; Brandeis, Goldschmidt & Co., Inc.; Cabot Corporation; Global Advanced Metals USA, Inc.; Chi Mei Metals Corporation; Elders Raw Materials Limited; Finamines, S.A.; AMG Advanced Metallurgical Group N.V.; Metallurg, Inc.; United States General Services Administration; Howard S. Gable; Osram Sylvania Inc.; Kennametal, Inc.; Lewis & Peat (Metals), Inc. f/k/a Lewis & Peat Services, Inc.; Li Tungsten Corporation; Philips North America LLC; Metals Marketing Australasia Pty. Ltd.; National Resources Trading Inc.; O'Dell Construction Company, Inc.; Philbro LLC; Samincorp, Inc. a/k/a Columbian Enterprises, Inc.; Sassoon Metals & Chemicals, Inc. a/k/a Sassoon Metals & Chemicals USA, Inc.; Traxys North America LLC; Everzinc USA, Inc.; Vernon E. Stratton; Edward Telucky; Thaisarco a/k/a Thailand Smelting & Refining Co., Ltd.; and Valenite, LLC (each is a "Vendor Defendant", and are collectively, the "Vendor Defendants"), FMRI alleges as follows:

## I.    STATEMENT OF THE CASE

1.    This is a civil action pursuant to the provisions of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601, *et seq.* ("CERCLA"), relating to the release and/or threatened release of hazardous substances from the former Fansteel, Inc. facility located at 10 Tantalum Place, Muskogee County, Muskogee, Oklahoma, as well as any area where hazardous substances that migrated from the Fansteel site have come to be located (collectively, the "Fansteel Site").

2.    The hazardous substances at the Fansteel Site have contaminated the soil, sediment, surface and ground water.

3.     The hazardous substances at the Fansteel Site have threatened the public health and the environment.

4.      Owner Defendant, the Muskogee City-County Port Authority, currently owns a portion of the Fansteel Site and each of the named Vendor Defendants arranged for, or succeeded to the liability of their predecessor who arranged for, the treatment and disposal of materials containing the hazardous substances that remain at the Fansteel Site.

5.      FMRI brings this action on its own behalf and on behalf of Fansteel, Inc. ("Fansteel"), as Assignee to that certain Assignment of Claims agreement entered into between FMRI and Fansteel.

6.      FMRI seeks cost recovery and contribution from each Defendant pursuant to Sections 107(a) and 113(f) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(f), for past and future response costs incurred and to be incurred by FMRI for response activities undertaken and to be undertaken at the Fansteel Site, along with a declaration as to each Defendant's liability and an allocation of past and future response costs among all parties.

## II.      JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to Sections 107(a) and 113(b) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(b), providing federal jurisdiction over controversies arising under CERCLA, and pursuant to 28 U.S.C. § 1331, providing federal jurisdiction over controversies involving questions of federal law.

8.      The Court also has jurisdiction over the request for declaratory relief under Section 113 of CERCLA, 42 U.S.C. § 9613 and 28 U.S.C. §§ 2201 and 2202.

9.      Venue is proper in this district pursuant to Sections 107(a) and 113(b) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(b), and 28 U.S.C. § 1391(b), because the release or threatened release of hazardous substances that give rise to this action occurred and/or are occurring at or from the Fansteel Site, located in this judicial district.

### III.    FACTUAL ALLEGATIONS

**A.**     **Allegations Common to All Claims**

10.     The Fansteel Site consists of approximately 110 acres located at 10 Tantalum Place in Muskogee, Muskogee County, Oklahoma.

11.     The portions of Fansteel Site are currently owned by three distinct entities: (a) Fansteel owns Parcels B and D, comprising approximately 80 acres, (b) FMRI owns Parcel C, comprising approximately 10 acres, and (c) the Muskogee City-County Port Authority owns Parcel A, comprising approximately 20 acres.

12.     Fansteel constructed a metal processing facility that was completed in 1957, which remains at the Fansteel Site.

13.     Fansteel began operations shortly after construction.

14.     Fansteel continued the operations of its metal processing facility at the Fansteel Site over the next 30 years, closing in 1990.

15.     Operations at the Fansteel Site included, in part, the treatment and processing of raw materials consisting of tin slags and metal-bearing ores that contained tantalum, columbium and other hazardous substances, including radiological substances, to produce tantalum-bearing and columbium-bearing products.

16.     The waste residual material containing hazardous substances generated from the metal processing operations at the Fansteel Site was treated and disposed of onsite in up to nine storage and wastewater treatment ponds, most of which remains in, on or at the Fansteel Site today.

17.     The metal processing operations at the Fansteel Site generated a significant amount of waste residuals.

18.     The waste residual material included radiological and non-radiological hazardous substances.

19.     After the initial processing of the raw materials in a digestion process, the waste residual materials generated were discharged to onsite storage ponds referred to as "Work-In-Progress" ("WIP") ponds.

20.     The intermediate product that was generated from the digestion process was then further processed to obtain the tantalum and columbium metal.

21.     The waste residual material generated from processing the intermediate product from the digestion process was treated and discharged to wastewater treatment ponds onsite referred to as the "CAF" ("CAF") ponds.

22.     The WIP ponds and the CAF ponds were contructed over various years.

23.     Some of the WIP ponds and the CAF ponds were earthen-lined, while others were lined with a composite material.

24.     Several significant releases of materials from the WIP ponds and the CAF ponds occurred over their years of operation thereby impacting the groundwater and soil onsite.

25.     Because the raw materials processed by Fansteel were considered "source material" under the Atomic Energy Act and Nuclear Regulatory Commision's ("NRC") regulations, the NRC issued Fansteel a Radioactive Material license beginning in 1967 (the "NRC License").

26.     In addition, because the CAF ponds discharged to the Arkansas River adjacent to the Fansteel Site, the Oklahoma Department of Environmental Qualtiy ("ODEQ") issued Fansteel a National Pollution Discharge Elimination System ("NPDES") permit.

27.     Fansteel ceased operations in approximately 1990.

28.     In 1993, Fansteel conducted a remedial assessment of the entire Fansteel Site (the "1993 Remedial Assessment").

29.     The 1993 Remedial Assessment indicated that the soil and groundwater in, on or at the Fansteel Site was contaminated with radiological and non-radiological substances.

30.     From 1990 until 2002, Fansteel prepared and filed at least two decommissioning plans with the NRC, both of which the NRC rejected.

31.     Following NRC's rejection of Fansteel's two decommissioning plans, Fansteel filed for bankruptcy protection in January of 2002.

32.     Fansteel emerged from bankruptcy in 2003 with an approved decommissioning plan ("DP") from the the NRC, as well as an approved Plan of Reorganization (the "2003 Plan of Reorganization").

33.     As part of the 2003 Plan of Reorganization, FMRI was created as a single-purpose entity and charged with the implementation of the approved DP.

34.      As part of Fansteel's 2003 Plan of Reorganization, Fansteel's NRC License and its NPDES permit were transferred to FMRI.

35.     FMRI's NRC License required it to decommission the Fansteel Site.

36.     FMRI is currently implementing the approved DP.

37.     ODEQ requires FMRI to address releases of non-radiological hazardous substances in, on or at the Fansteel Site.

38.     Financial assurance funding for the required work for the DP at the Fansteel Site was provided by Fansteel through a series of unsecured promissory notes (the "Financial Assurance Notes").

39.     FMRI began implementation of the DP in 2005, but as a result of disagreements with its contractor, the contract with the contractor was terminated and litigated until 2010.

40.     In 2006, as a result of a groundwater investigation conducted by ODEQ on Parcel A owned by the Port, an extensive chlorinated solvent groundwater contamination plume was discovered.

41.     FMRI re-started implementation of the DP in 2010.

42.     In December 2013, a balloon payment required from Fansteel under its Financial Assurance Notes came due.

43.     After Fansteel was unable to make the balloon payment, governmental authorities declared Fansteel in default of its Financial Assurance Notes.

44.     As a result of the default, Fansteel, FMRI and the Department of Justice ("DOJ"), NRC and ODEQ, entered into a series of forbearance agreements which strictly controlled Fansteel's assets so that funds could be paid to FMRI to continue to implement the DP.

45.     Thereafter, Fansteel and the DOJ, NRC and ODEQ attempted to reach a long-term forbearance agreement, but these negotiations ultimately failed.

46.     After the negotiations to reach a long-term forbearance agreement failed, Fansteel filed for bankruptcy protection in September 2016 ("Second Bankruptcy").

47.     In Fansteel's Second Bankruptcy, Fansteel and FMRI entered into an Environmental Settlement Agreement ("ESA") with the United States on behalf of the NRC, and Environmental Protection Agency ("EPA") and the ODEQ which required, *inter alia*, that FMRI complete the investigation and remediation of the Fansteel Site as required by the NRC, EPA and ODEQ.

48.     The ESA required that FMRI pursue all potentially responsible parties ("PRPs") under CERCLA for their share of Fansteel's and FMRI's response costs incurred and to be incurred to investigate and remediate the Fansteel Site.

49.     In the Second Bankruptcy, the Bankrutpcy Court approved the ESA on June 2, 2020 and Fansteel's Plan of Liquidation on August 6, 2020.

50.     To date, FMRI and Fansteel have incurred in excess of $25 million in response costs to perform various required response activities at the Fansteel Site ("Past Response Costs").

51.     The Past Response Costs were necessary to address the release and/or threatened release of hazardous substances in, on or at the Fansteel Site.

52.     The Past Response Costs were required by EPA, the NRC and ODEQ and as such are consistent with the National Contingency Plan ("NCP").

53.     In addition, Fansteel and FMRI have voluntarily incurred additional recoverable response costs, including attorney's fees and expenses to search for all PRPs associated with the Fansteel Site and to perform administrative functions, that are closely tied to the response activities at the Fansteel Site, which FMRI is also entitled to recover against parties liable under CERCLA ("Additional Response Costs").

54.     FMRI will continue to incur response costs to conduct response actions at the Fansteel Site as required by the EPA, ODEQ and the NRC, consistent with the NCP ("Future Response Costs"), in addition to the Past Response Costs and Additional Response Costs already incurred.

55.     The Past Response Costs, Additional Response Costs and Future Response Costs constitute all of the response costs that Fansteel and FMRI have incurred or will incur in connection with the investigation and remediation of the Fansteel Site ("Total Response Costs").

**B.    Allegations Common to Claims Against the Owner Defendant, Muskogee City-County Port Authority.**

56.     The Muskogee City-County Port Authority ("Port") purchased 20 acres of the Fansteel Site in June 1999, and is the current owner of approximately 20 acres, described as Parcel A, of the Fansteel Site.

57.     Historically, Parcel A (and the adjoining Parcel B) of the Fansteel Site were included, along with Parcels C and D, in Fansteel's NRC License.

58.     In order to remove Parcels A (and B) from the NRC License, so that these parcels could be sold, the NRC required that Fansteel perform a radiological assessment of these two parcels for NRC review to determine whether, in the NRC's opinion, Parcels A (and B) could be removed from the NRC License.

59.     In 1993, Fansteel's consultant, Earth Sciences Consultants, Inc. ("ESC") performed the 1993 Remedial Assessment.

60.     A portion of the 1993 Remedial Assessment focused on the Northwest Property (Parcels A and B) that included only limited soil and groundwater data and radiation surveys, and was summarized in a separate report that Fansteel submitted to the NRC for review and approval.

61.     Based upon the data presented in the 1993 Remedial Assessment related to the Northwest Property, the NRC removed Parcels A (and B) from Fansteel's NRC License by Amendment #5 dated March 27, 1997.

62.     In early 1999, the Port and Fansteel began negotiations related to the Port's purchase of Parcel A.

63.     At the time of these negotiations, ESC had been Fansteel's environmental consultant for almost 10 years providing Fansteel with the necessary technical assistance to prepare proposals for a Decommissioning Plan that was required by the NRC.

64.     The work ESC performed for Fansteel included the investigation of the nature and extent of any radiological and non-radiological contamination present at the Fansteel Site.

65.     ESC provided technical assistance to Fansteel regarding compliance with Fansteel's NDPES discharge permit issued to Fansteel by ODEQ.

66.     ESC was Fansteel's technical representative interfacing with both the NRC and ODEQ and participating in the negotiations with the NRC and ODEQ over the scope of the investigation and remediation of any radiological and non-radiological contamination present at the Fansteel Site.

67.     In May 1999, the Port engaged ESC to conduct an independent environmental assessment of Parcel A to satisfy the "all appropriate inquiry" ("AAI") diligence required to qualify for the innocent landowner defense to CERCLA liability.

68.     Upon information and belief, at the time the Port engaged ESC in May 1999, the Port was aware that ESC had served as Fansteel's consultant.

69.     ESC prepared a report for the Port entitled, "Technical Report Phase I Environmental Site Assessment Update, Northwest Property Area, Muskogee, Muskogee County Oklahoma" dated May 17, 1999 ("Technical Report").

70.     Upon information and belief, the Technical Report was intended to satisfy AAI criteria.[1]

71.     ESC did not prepare the Technical Report in accordance with the AAI criteria.

72.     ESC's Technical Report was an update of a portion of its 1993 Remedial

---

[1]  The AAI standard that was customarily used as the AAI practice for commercial/industrial property in May 1999 was the American Society for Testing and Materials ("ASTM") Standard Practice for Environmental Site Assessment: Phase I Environmental Assessment Process, designated as ASTM E 1527-97.

Assessment.

73.     ESC's Technical Report was not a Phase I Environmental Site Assessment that could be used to satisfy CERCLA's AAI criteria.

74.     In concluding that Parcel A "did not present a significant environmental concern," ESC's Technical Report relied upon the very limited soil and groundwater data generated several years prior as part of its 1993 Remedial Assessment for Fansteel.

75.     Most of the soil and groundwater data ESC relied upon for the Technical Report did not include any data on volatile organic compunds, including chlorinated solvents.

76.     The Port purchased the property from Fansteel in June 1999.

77.     Seven years later, in 2006, an extensive chlorinated solvent groundwater plume under Parcel A was discovered as a result of a limited soil and groundwater investigation performed by ODEQ on behalf of the Port in connection with the Port's potential purchase of Parcel B.

78.     ESC's reliance on limited sampling data evidenced that ESC's Technical Report did not satisfy the requirements of a Phase I Environmental Site Assessment appropriate to meet AAI criteria.

79.     A satisfactory AAI analysis would have recommended a more extensive soil and groundwater sampling program, to determine whether Parcel A had been impacted by the activities conducted on the adjacent parcels comprising the Fansteel Site.

80.     On information and belief, the Port has not met AAI criteria to satisfy the requirements of the innocent landowner defense under CERCLA at Section 107(b)(3) and Section 101(35), 42 U.S.C. § 9607(b)(3) and § 9601(35).

81.     Even after the Port had actual knowledge of the extensive groundwater contamination plume underneath its property, based upon information and belief, the Port has to this day not taken any reasonable steps to stop the continuing release of the chlorinated solvents, to prevent any further release of chlorinated solvents throughout its property, or to prevent or limit exposure to individuals or the environment from the previously released chlorinated  solvents.

82.     On information and belief, the Port has not exercised due care with respect to the chlorinated solvents present in the groundwater on its property, taking into consideration the characteristics of the chlorinated solvents present in the groundwater, in light of all the relevant facts and circumstances.

83.     On information and belief, the Port did not take any precautions against any foreseeable acts or omissions of Fansteel and the consequences that could foreseeably result from such acts or omissions with respect to the contaminated groundwater water.

84.     Even after the Port had actual knowledge of the chlorinated solvent plume on its property in 2006, on information and belief, the Port did not take appropriate and reasonable actions.

**C.**     **Allegations Common to All Claims Against the Vendor Defendants.**

85.     Fansteel purchased raw materials consisting of tin slags or metal-bearing ores directly from each Vendor Defendant.

86.     The purchase arrangements with each Vendor Defendant required that the raw material be weighed and sampled by a neutral referee to determine the weight and percentage of tantalum and/or columbium in the raw material.

87.     After Fansteel and each Vendor Defendant agreed on the weight and percentage content, the amount of tantalum and/or columbium in the material could be determined.

88.     Fansteel paid each Vendor Defendant the agreed-upon price per pound for either the tantalum or columbium content within the raw material.

89.     Fansteel did not pay each Vendor Defendant any amount for the residual waste material in the raw material, which sometimes accounted for up to 85% of the raw material delivered.

90.     The residual waste material was treated and disposed by Fansteel in the onsite ponds, and today remains in, on, or at the Fansteel Site.

**D.     Allegations Specific to the Parties**

      **1.     *The Plaintiff***

91.     FMRI, Inc. is a Delaware corporation formed as a special purpose entity as part of the Fansteel 2002 bankruptcy to fulfill the obligations required under its NRC License and its NPDES permit.

      **2.     *The Defendants***

92.     Each Defendant falls into one of two categories: (a) a PRP that is a current owner of a portion of the Fansteel Site where hazardous substances have been located, requiring a response; or (b) a PRP that arranged for the treatment and disposal of hazardous substances delivered to the Fansteel Site that did not include tantalum and/or columbium, consisting of the residual waste material that was disposed of in the nine onsite ponds and which constitute a threatened release by remaining in, on or at the Fansteel Site, requiring a response.

      **a.     The Owner Defendant**

93.     The Muskogee City-County Port Authority is a public trust formed by agreement between the City of Muskogee and Muskogee County ("Owner Defendant").

94.     As alleged more fully at Counts I, II and III below, the Port is the current "owner," as the term is defined under CERCLA, of Parcel A of the Fansteel Site.

95.     To date, the Port has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

### b.     The Vendor Defendants

96.     Upon information and belief, at all times material to the transactions that occurred between it and Fansteel, Defendant Nathaniel ("Nat") E. Opara did business under the fictitious name "AFAM, Inc." ("AFAM").

97.     According to the records of the Minnesota Secretary of State, no entity by the name AFAM, Inc. appears as having been duly organized as a legally recognized entity under the laws of the State of Minnesota. According to Fansteel's records, AFAM operated with its principal place of business in La Crescent, Minnesota.

98.     As alleged more fully herein, AFAM is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

99.     According to Fansteel's records, Defendant AFAM, through Mr. Opara, entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

100.     To date, Defendant AFAM has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

101.     Upon information and belief, Defendant Amalgamated Metal Corporation PLC ("AMC Group") is an "an international group which trades, distributes and manufactures metals, metal products and construction materials." *See* https://www.amcgroup.com/about, last visited February 20, 2021.

102.    AMC Group operates "a network of offices around the world either directly involved in trading or providing logistical support," as well as "distribut[es], process[es] or manufactur[es] raw materials and added value products for a wide range of industrial applications", with a "focus . . . in base metals and other alloys and, in particular, tin, aluminum, copper and lead."  *See* https://www.amcgroup.com/about, last visited February 20, 2021.

103.    Upon information and belief, AMC Group wholly owns Defendant Amalgamet, Inc. and Defendant Thaisarco a/k/a Thailand Smelting & Refining Co., Ltd., and is liable as their successor.

104.    Upon information and belief, at all times material to the transactions that occurred between it and Fansteel, Defendant Amalgamet, Inc. was a corporation duly organized and existing under the laws of the State of New York with its principal place of business in White Plains, New York.

105.    Defendant Amalgamet, Inc. is currently an active New York corporation wholly owned by Defendant AMC Group ("Amalgamet-AMC").

106.    As alleged more fully herein, Amalgamet-AMC is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

107.    According to Fansteel's records, Defendant Amalgamet-AMC entered into purchase arrangements with Fansteel on its own behalf, and on behalf of Finnamines, S.A., and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

108.    To date, Defendant Amalgamet-AMC has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

109.    Upon information and belief, Defendant JX Nippon Mining & Metals Corporation ("JX Nippon") is a corporation duly organized and existing under the laws of the State of Arizona with its principal place of business in Chandler, Arizona.

110.    Defendant JX Nippon "acquired the outstanding shares of German firm Taniobis GmbH . . . one of the world's leading suppliers of tantalum and niobium powders and other products used in capacitors, semiconductor materials, and surface acoustic wave (SAW) devices." *See* https://www.nmm.jx-group.co.jp/english/company/industry/tanb/, last visited February 21, 2021.

111.    Upon information and belief, prior to acquisition by JX Nippon, Taniobis GmbH was the successor by merger to V-Tech Corporation a/k/a V-Tech Fansteel, d/b/a Arm Stand Co., Ltd., and is also successor by merger to Hermann C. Starck Inc. *See* https://www.taniobis.com/home/about-us/company-history~bc.en.html, last visited February 20, 2021.

112.    Defendant JX Nippon is liable as the successor to Arm Stand Co., Ltd. ("Arm Stand") through its merger acquisition of Taniobis GmbH.

113.    Arm Stand is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

114.    According to Fansteel's records, Defendant Arm Stand entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

115.    To date, Defendant Arm Stand has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

116.    Upon information and belief, at all times material to the transactions that occurred between them and Fansteel, Defendant Associated Metals & Minerals Corp., was a corporation duly organized and existing under the laws of the State of New York with its principal place of business in White Plains, New York that was succeeded through merger by Metallon Holdings Corp., which was subsequently dissolved as a New York corporation on or about July 1, 2002; Defendant Associated Metals & Minerals Export Corporation was a corporation duly organized and existing under the laws of the State of New York with its principal place of business in New York, New York but subsequently dissolved as a New York corporation on or about March 24, 1993; Defendant Associated Metals & Minerals Foundation Inc., was a corporation duly organized and existing under the laws of the State of New York with its principal place of business in New York, New York and succeeded by The Meno Lissauer Foundation, Inc., a corporation organized and existing under the laws of the State of New York with its principal place of business in New York, New York; and Defendant Associated Metals & Minerals Trade Co., Inc. was a corporation duly organized and existing under the laws of the State of New York with its principal place of business in New York, New York but subsequently dissolved as a New York corporation on or about December 22, 1986; and Defendant Associated Metals Western Hemisphere Corporation was a corporation duly organized and existing under the laws of the State of New York with its principal place of business in New York, New York but subsequently dissolved as a New York corporation on or about December 22, 1986 (collectively, the "Associated Metals Defendants"). Plaintiff's investigation into successor liability for the dissolved Associated Metals Defendants is ongoing. Upon further information and belief, Defendant The Meno Lissauer Foundation, Inc. is liable as the successor to Associated Metals & Minerals Foundation, Inc.  As alleged more fully

herein, each of the Associated Metals Defendants is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

117.    According to Fansteel's records, the Associated Metals Defendants entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

118.    To date, the Associated Metals Defendants have not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

119.    Upon information and belief, at all times material to the transactions that occurred between them and Fansteel, Defendant Billiton Trading Company, Inc. was a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York but subsequently dissolved as a Delaware corporation, and Defendant Billion Metals, Inc. was a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York but subsequently dissolved as a Delaware corporation.  Upon further information and belief, BHP Minerals Service Company is liable as the successor to Billiton Metals, Inc. and Billiton Trading Company Inc. and is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Houston, Texas ("BHP Billiton"). As alleged more fully herein, BHP Billiton is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

120.    According to Fansteel's records, Defendant BHP Billiton entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

121.    To date, Defendant BHP Billiton has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

122.    Upon information and belief, Defendant Bomar Resources Inc. NV is a corporation duly organized and existing under the laws of the State of Pennsylvania with its principal place of business in Pittsburgh, Pennsylvania and is liable as the successor to Bomar Resources Inc. ("Bomar Resources"). Upon further information and belief, at all times material to the transactions that occurred between Fansteel and it, Bomar Resources, Inc. was a corporation duly organized and existing under the laws of the State of New York with its principal place of business in New York, New York but subsequently dissolved as a New York corporation and Defendant Bomar Resources succeeded to its liabilities.  Bomar Resources is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

123.    According to Fansteel's records, Bomar Resources entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

124.    To date, Bomar Resources has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

125.    Upon information and belief, at all times material to the transactions that occurred between it and Fansteel, Defendant Brandeis, Goldschmidt & Co., Inc., was a company duly organized and registered under the laws of the United Kingdom with Companies House with its principal place of business in London, England but subsequently dissolved as a United Kingdom company on or about September 6, 2013 ("Brandeis Goldschmidt").  Plaintiff's investigation into successor liability for the dissolved Brandeis Goldschmidt is ongoing. Brandeis Goldschmidt is an

"arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

126.    According to Fansteel's records, Brandeis Goldschmidt entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

127.    To date, Brandeis Goldschmidt has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

128.    Upon information and belief, at all times material to the transactions that occurred between Fansteel and it, Defendant Cabot Corporation was and is now a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Boston, Massachusetts. Upon further information and belief, Defendant Global Advanced Metals USA, Inc. is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Boston, Massachusetts ("GAM"). A division of GAM "focuse[s] specifically on tantalum metals for the future….[and among its] primary assets [a]re the Greenbushes … tantalum mines located in Western Australia. …[one of the] two … largest tantalum resources in the world, [and] in 2012 purchased the Cabot [Corp.'s] Supermetals business,…which converts tantalum ores and concentrates into a range of metallurgical products including different grades of capacitor powders." *See* https://www.globaladvancedmetals.com/global-operations-core-values/, last visited March 7, 2021. Plaintiff is unable to determine whether or not Defendant Global Advanced Metals USA, Inc. succeeded to the liabilities of Defendant Cabot Corporation through acquisition, and therefore names both Defendants as jointly and severally liable (collectively "Cabot-GAM").  Cabot-GAM is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

129.    According to Fansteel's records, Cabot-GAM entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

130.    To date, Cabot-GAM has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

131.    Upon information and belief, at all times material to the transactions that occurred between it and Fansteel, Defendant Chi Mei Metals Corporation was a corporation duly organized and existing under the laws of the State of New York with its principal place of business in New York, New York but subsequently dissolved as a New York corporation on or about December 15, 1980. ("Chi Mei Metals"). Plaintiff's investigation into successor liability for the dissolved Chi Mei Metals is ongoing. Chi Mei Metals is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

132.    According to Fansteel's records, Chi Mei Metals Corporation entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

133.    To date, Chi Mei Metals Corporation has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

134.    Upon information and belief, at all times material to the transactions that occurred between it and Fansteel, Defendant Elders Raw Materials Limited was a corporation duly organized and existing under the laws of the State of Connecticut with its principal place of business in Stamford, Connecticut but subsequently dissolved as a Connecticut corporation on or about December 1, 1986. ("Elders Material"). Plaintiff's investigation into successor liability for

the dissolved Elders Material is ongoing. Elders Material is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

135.    According to Fansteel's records, Elders Material entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

136.    To date, Elders Raw Material Limited has not paid any of the Total Response Costs incurred by Fansteel and FMRI at the Fansteel Site.

137.    Upon information and belief, at all times material to the transactions that occurred between it and Fansteel, Defendant Finamines, S.A. was a Swiss corporation but subsequently liquidated. ("Finamines"). Plaintiff's investigation into successor liability for the dissolved Finamines is ongoing. Finamines is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

138.    According to Fansteel's records, Finamines entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

139.    To date, Finamines has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

140.    Upon information and belief, Defendant AMG Advanced Metallurgical Group N.V. is the Dutch parent corporation of Metallurg, Inc., a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Wayne, Pennsylvania which "traces its origins to the predecessor companies of ALD Vacuum Technologies GmbH (ALD), founded in Germany during the mid-1800s, and GfE Gesellschaft für Elektrometallurgie mbH (GfE), founded in 1911." *See* https://amg-nv.com/about-amg/our-history, last visited

February 21, 2021. Upon further information and belief, at all times material to the transactions that occurred between Fansteel and it, GfE Gesellschaft für Elektrometallurgie mbH (GfE) was a German limited liability company with its principal place of business in Nuremberg, Germany, and Defendant Metallurg, Inc. a/k/a AMG Advanced Metallurgical Group has succeeded to its liabilities ("GfE-AMG"). GfE-AMG is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

141.    According to Fansteel's records, GfE-AMG entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

142.    To date, GfE-AMG has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

143.    Upon information and belief, at all times material to the transactions that occurred between Fansteel and it, the United States General Services Administration (GSA) was and currently is an independent agency of the United States government ("GSA"). The GSA is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

144.    According to Fansteel's records, the GSA entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

145.    To date, GSA has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

146.    Upon information and belief, at all times material to the transactions that occurred between Fansteel and him, Howard S. Gable was a natural person and resident of Kansas City,

Missouri ("Howard Gable"). Plaintiff's investigation into Howard Gable and his potential successor liability is ongoing. Howard Gable is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

147.    According to Fansteel's records, Howard Gable entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

148.    To date, Howard Gable has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

149.    As described more fully in Paragraph No. 128 above, upon information and belief, GAM owns the Greenbushes mines in Australia, and is the successor to the liabilities of Greenbushes (USA), Inc., d/b/a Greenbushes Ltd., and also d/b/a Greenbushes Tin Ltd. ("Greenbushes-GAM"). Upon further information and belief, at all times material to the transactions that occurred between it and Fansteel, Greenbushes (USA), Inc. was an Ohio corporation duly organized and existing under the laws of the State of Ohio with its principal place of business in Twinsburg, Ohio but subsequently dissolved as an Ohio corporation and both Greenbushes Ltd. f/k/a Greenbushes Tin Ltd. was an Australian public company subsequently deregistered on or about November 23, 2012.  Greenbushes-GAM is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

150.    According to Fansteel's records, Greenbushes-GAM entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

151.     To date, Greenbushes-GAM has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

152.     Upon information and belief, Defendant Osram Sylvania Inc. is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Massachusetts and is liable as the successor to GTE Products Corporation ("GTE Products"). Upon further information and belief, at all times material to the transactions that occurred between Fansteel and it, GTE Products Corporation was a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Towanda, Pennsylvania but subsequently changed its name and Defendant Osram Sylvania Inc. succeeded to its liabilities. GTE Products is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

153.     According to Fansteel's records, GTE Products entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

154.     To date, GTE Products has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

155.     As described more fully in Paragraph No. 111 and Paragraph No. 112 above, upon information and belief, Defendant JX Nippon Mining & Metals Corporation is liable as the successor to Hermann C. Starck, Inc. through its merger acquisition of Taniobis GmbH ("Hermann Starck"). Upon further information and belief, at all times material to the transactions that occurred between it and Fansteel, Hermann C Starck, Inc. was a New York corporation duly organized and existing under the laws of the State of New York with its principal place of business in Albany, New York but subsequently merged into Taniobis GmbH. Hermann Starck is an "arranger," as

that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

156.    According to Fansteel's records, Hermann Starck entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

157.    To date, Hermann Starck has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

158.    Upon information and belief, at all times material to the transactions that occurred between Fansteel and it, Kennametal, Inc. was and is now a corporation duly organized and existing under the laws of the State of Pennsylvania with its principal place of business in Latrobe, Pennsylvania ("Kennametal"). Kennametal is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

159.    According to Fansteel's records, Kennametal entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

160.    To date, Kennametal has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

161.    Upon information and belief, at all times material to the transactions that occurred between it and Fansteel, Defendant Lewis & Peat (Metals), Inc. f/k/a Lewis & Peat Services, Inc. was a corporation duly organized and existing under the laws of the State of New York with its principal place of business in New York, New York but subsequently dissolved as a New York corporation on or about December 1999. ("Lewis & Peat"). Another entity, Lewis & Peat Metals Ltd., was a company duly organized and registered under the laws of the United Kingdom with

Companies House with its principal place of business in London, England, but was subsequently dissolved as a United Kingdom company on or about September 22, 2020. Plaintiff's investigation into successor liability for the dissolved Lewis & Peat is ongoing. Lewis & Peat is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

162.    According to Fansteel's records, Lewis & Peat entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

163.    To date, Lewis & Peat has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

164.    Upon information and belief, at all times material to the transactions that occurred between it and Fansteel, Defendant Li Tungsten Corporation was a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Glen Cove, New York but subsequently dissolved as a Delaware corporation. ("Li Tungsten"). Plaintiff's investigation into successor liability for the dissolved Li Tungsten is ongoing. Li Tungsten is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

165.    According to Fansteel's records, Li Tungsten entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

166.    To date, Li Tungsten has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

167.    Upon information and belief, Defendant Philips North America LLC, is liable as the successor to Mepco/Electra, Inc. and North American Philips, and is a limited liability company duly organized and existing under the laws of the State of Delaware with its principal place of business in Cambridge, Massachusetts, and succeeded Philips Electronics North America Corporation on or about April 20, 2017 ("Mepco-Philips"). Upon further information and belief, at all times material to the transactions that occurred between Fansteel and it, Mepco/Electra, Inc. was a wholly owned subsidiary of North American Philips and a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York, but subsequently dissolved as a Delaware corporation and succeeded by Philips Electronics North America Corporation, now known as Defendant Philips North America LLC. Mepco-Philips is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

168.    According to Fansteel's records, Mepco-Philips entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

169.    To date, Mepco-Philips has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

170.    Upon information and belief, at all times material to the transactions that occurred between Fansteel and it, Defendant Metallurg, Inc. was and is currently a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Wayne, Pennsylvania and, as described more fully in Paragraph No. 140 above, Defendant AMG Advanced Metallurgical Group N.V. is the Dutch parent corporation of Metallurg, Inc. and

liable for it ("Metallurg-AMG"). Metallurg-AMG is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

171.    According to Fansteel's records, Metallurg-AMG entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

172.    To date, Metallurg-AMG has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

173.    Upon information and belief, at all times material to the transactions that occurred between it and Fansteel, Defendant Metals Marketing Australasia Pty. Ltd. was an Australian Proprietary Company duly organized and existing under the laws of Australia with offices in Sydney, Australia but subsequently deregistered as an Australian company on or about July 2, 1974 ("Metals Marketing"). Plaintiff's investigation into successor liability for the dissolved Metals Marketing is ongoing. Metals Marketing is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

174.    According to Fansteel's records, Metals Marketing entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

175.    To date, Metals Marketing has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

176.    Upon information and belief, at all times material to the transactions that occurred between it and Fansteel, Defendant National Resources Trading Inc. was a corporation duly organized and existing under the laws of the State of New York with its principal offices in New York, New York but subsequently dissolved as a New York corporation on or about July 3, 1973

("National Resources"). Plaintiff's investigation into successor liability for the dissolved National Resources is ongoing. National Resources is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

177.    According to Fansteel's records, National Resources entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

178.    To date, National Resources has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

179.    Upon information and belief, and as described in Paragraph No. 167 above, Defendant Philips North America LLC, is liable as the successor to North American Philips Company, Inc., and is a limited liability company duly organized and existing under the laws of the State of Delaware with its principal place of business in Cambridge, Massachusetts that succeeded Philips Electronics North America Corporation on or about April 20, 2017 ("Philips N.A."). Upon further information and belief, at all times material to the transactions that occurred between Fansteel and it, North American Philips Company, Inc. was a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York  but subsequently succeeded by Philips Electronics North America Corporation, now known as Defendant Philips North America LLC.  Philips N.A. is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

180.    According to Fansteel's records, Philips N.A. entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

181.    To date, Philips N.A. has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

182.    Upon information and belief, at all times material to the transactions that occurred between it and Fansteel, Defendant O'Dell Construction Company, Inc. was a corporation duly organized and existing under the laws of the State of Alabama with its principal offices in Prattville, Alabama but subsequently dissolved as an Alabama corporation on or about October 17, 2000 ("O'Dell Construction"). Plaintiff's investigation into successor liability for the dissolved O'Dell Construction is ongoing. O'Dell Construction is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

183.    According to Fansteel's records, O'Dell Construction entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

184.    To date, O'Dell Construction has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

185.    Upon information and belief, Defendant Philbro LLC, is liable as the successor to Phillip Brothers, Inc., and is a limited liability company duly organized and existing under the laws of the State of New York with its principal place of business in Stamford, Connecticut ("Philbro"). Upon further information and belief, at all times material to the transactions that occurred between Fansteel and it, Philipp Brothers, Inc. was a corporation duly organized and existing under the laws of the State of New York with its principal place of business in New York, New York but subsequently dissolved and succeeded by Philbro LLC. Philbro is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

186.     According to Fansteel's records, Philbro entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

187.     To date, Philbro has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

188.     Upon information and belief, at all times material to the transactions that occurred between it and Fansteel, Defendant Samincorp, Inc. was a corporation duly organized and existing under the laws of the State of New York with its principal place of business in New York, New York but subsequently changed its name to Columbian Enterprises, Inc. on or about September 21, 1983 ("Samincorp"). Columbian Enterprises, Inc. was a company duly organized and registered under the laws of the State of New York with its principal place of business in New York, New York but subsequently dissolved as a New York corporation on or about September 14, 2005. Plaintiff's investigation into successor liability for the dissolved Samincorp and its successor Columbian Enterprises, Inc. is ongoing. Samincorp is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

189.     According to Fansteel's records, Samincorp entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

190.     To date, Samincorp has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

191.     Upon information and belief, at all times material to the transactions that occurred between it and Fansteel, Defendant Sassoon Metals & Chemicals, Inc. a/k/a Sassoon Metals &

Chemicals USA, Inc. was a corporation duly organized and existing under the laws of the State of New York with its principal offices in New York, New York but subsequently dissolved as a New York corporation on or about September 25, 1991 ("Sassoon Metals"). Plaintiff's investigation into successor liability for the dissolved Sassoon Metals is ongoing. Sassoon Metals is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

192.    According to Fansteel's records, Sassoon Metals entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

193.    To date, Sassoon Metals has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

194.    At all times material to the transactions that occurred between Fansteel and it, Sogem Corporation was a corporation duly organized and existing under the laws of the State of New York with its principal place of business in New York, New York, but was subsequently succeeded by merger as "Umicore." Upon further information and belief, Defendant Traxys North America LLC is liable as the successor to Umicore and is a limited liability company duly organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York ("Sogem-Traxys"). Additionally, upon further information and belief, Defendant Everzinc USA, Inc. is liable as the successor to Umicore and is a corporation duly organized and existing under the laws of the State of New York with its principal place of business in New York, New York ("Sogem-Everzinc"). Plaintiff is unable to determine which of Defendant Traxys North America LLC or Defendant Everzinc USA, Inc. succeeded to the liabilities of Sogem Corporation, and therefore names both Defendants as jointly and severally liable. Each of Sogem-

34

Traxys and Sogem-Everzinc is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

195.    According to Fansteel's records, Sogem-Traxys and Sogem-Everzinc entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

196.    To date, Sogem-Traxys and Sogem-Everzinc have not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

197.    Upon information and belief, at all times material to the transactions that occurred between Fansteel and him, Vernon E. Stratton was a natural person and resident of Pringle, South Dakota ("Vernon Stratton"). Upon further information and belief, Vernon Stratton was deceased on May 15, 2015. Plaintiff's investigation into potential successor liability of Vernon Stratton is ongoing. Vernon Stratton is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

198.    According to Fansteel's records, Vernon Stratton entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

199.    To date, Vernon Stratton has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

200.    Upon information and belief, at all times material to the transactions that occurred between Fansteel and him, Edward Telucky was a natural person and resident of Santa Fe, New Mexico ("Edward Telucky"). Plaintiff's investigation into Edward Telucky and his potential successor liability is ongoing. Edward Telucky is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

201.    According to Fansteel's records, Edward Telucky entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

202.    To date, Edward Telucky has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

203.    As described more fully in Paragraph No. 101 through Paragraph No. 103 above, upon information and belief, Defendant AMC Group wholly owns Defendant Thaisarco a/k/a Thailand Smelting & Refining Co., Ltd., and is liable as its successor ("Thaisarco"). Upon further information and belief, at all times material to the transactions that occurred between it and Fansteel, Thaisarco a/k/a Thailand Smelting & Refining Co., Ltd., is a registered company with the Thailand Department of Business Development with its principal place of business in Bangkok, Thailand and is now wholly owned by Defendant AMG Group.  Thaisarco is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

204.    According to Fansteel's records, Thaisarco entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

205.    To date, Thaisarco has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

206.    Upon information and belief, Defendant Valenite, LLC, is liable as the successor to Valeron Corporation a/k/a Valeron Metals and is a limited liability company duly organized and existing under the laws of the State of Delaware with its principal place of business in Madison Heights, Michigan ("Valenite"). Upon further information and belief, at all times material to the

transactions that occurred between Fansteel and it, Valeron Corporation a/k/a Valeron Metals was a corporation duly organized and existing under the laws of the State of Michigan with its principal place of business in Troy, Michigan but subsequently dissolved and succeeded by Valenite LLC. Valenite is an "arranger," as that term is defined under CERCLA, for the treatment and disposal of hazardous substances at the Fansteel Site.

207.   According to Fansteel's records, Valenite entered into purchase arrangements with Fansteel and contributed materials containing hazardous substances to the Fansteel Site for treatment and disposal.

208.   To date, Valenite has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

## COUNT I

### COST RECOVERY UNDER CERCLA
### AGAINST THE OWNER DEFENDANT

209.   Plaintiff realleges and incorporates by reference Paragraph No. 1 through Paragraph No. 208 of this Complaint, as if fully restated herein.

210.   Section 107(a)(1) of CERCLA, 42 U.S.C. §§ 9607(a)(1), provides, in relevant part, that:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section --
>
> (1) the owner and operator of a vessel or a facility...
>  ….
>
> shall be liable for—
>
> (A)   all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;
> (B)   any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C)     damages for injury to, destruction of, or loss of natural resources including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D)     the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

211.    "Facility" is defined in CERCLA Section 101(9) as "any building, structure, installation, equipment, pipe or pipeline" or "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed...." 42 U.S.C. § 9601(9).

212.    "Person" is defined in CERCLA Section 101(21) as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(20).

213.    "Release" is defined in CERCLA Section 101(22) as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)...." 42 U.S.C. § 9601(22).

214.    "Response" is defined in CERCLA Section 101(25), and includes "removal" actions, "remedial" actions, and enforcement activities related thereto. 42 U.S.C. § 9601(25).

215.    The Fansteel Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

216.    There has been a "release" and/or a threatened "release" of "hazardous substances" at the Fansteel Site which has caused the incurrence of "response costs" by the Fansteel and FMRI, within the meanings of Sections 101(22), 101(14) and 107 of CERCLA, 42 U.S.C. §§ 9601(22), 9601(14) and 9607.

217.    FMRI is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

218.    Fansteel is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

219.    The Port is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

220.    Pursuant to CERCLA, 42 U.S.C. §§ 9607(a)(1), the Port is liable as a current owner of Parcel A, comprising approximately 20 acres of the Fansteel Site and, as alleged more fully in Section III. B. above.

221.    The Port does not qualify for the innocent purchase defense under CERCLA set forth in Section 107(b)(3) and Section 101(35), 42 U.S.C. § 9607(b)(3) and § 9601(35).

222.    As a result of the release and threatened release of hazardous substances at or from the Fansteel Site, including the chlorinated solvent plume located under Parcel A that is owned by the Port, FMRI and Fansteel have incurred response costs and will continue to incur costs of "response," as that term is defined by Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).

223.    The response costs incurred by FMRI and Fansteel in connection with the Fansteel Site are consistent with the NCP.

224.    Pursuant to CERCLA Section 107, 42 U.S.C. §§ 9607 the Port is strictly, jointly and severally liable for the Total Response Costs incurred and to be incurred by FMRI and Fansteel in response to the release or threatened release of hazardous substances at and from the Fansteel Site.

**WHEREFORE**, FMRI, Inc., on its own behalf and as assignee of Fansteel, Inc., respectfully requests that this Court enter a judgment in its favor and against the Port holding that

the Port is strictly, jointly and severally liable for the Total Response Costs incurred and to be

incurred by FMRI and Fansteel, including appropriate pre-judgment interest, in connection with

the release and/or threatened release of hazardous substances at the Fansteel Site. FMRI further

requests that this Court award interest and costs of suit, including reasonable attorney's fees and

consultant fees as permitted by law; and order any such other relief as the Court may deem just

and appropriate under the circumstances.

## COUNT II

### CONTRIBUTION UNDER CERCLA
### <u>AGAINST THE OWNER DEFENDANT</u>

225.    Plaintiff realleges and incorporates by reference Paragraph No. 1

through Paragraph No. 208 of this Complaint, as if fully restated herein.

226.    Sections 113(f)(1) and (3)(B) of CERCLA, 42 U.S.C. §§ 9613(f)(1) and (3)(B),

provide, in relevant part, that:

> Any person may seek contribution from any other person who is liable or
> potentially liable under section 9607(a)....

> A person who has resolved its liability to the United States or a State for some
> or all of a response action or for some or all of the costs of such action in an
> administrative or judicially approved settlement may seek contribution from
> any person who is not party to a settlement....

227.    FMRI and Fansteel have resolved their liability to EPA for matters covered in the

ESA.

228.    The Port is a liable party under CERCLA and does not qualify for the innocent

landowner defense under CERCLA set forth in Section 107(b)(3) and Section 101(35), 42 U.S.C.

§ 9607(b)(3) and § 9601(35), as alleged more fully in Section III. B. above, but the Port has not

resolved its liability to FMRI, Fansteel or the EPA.

229.     To date, FMRI and Fansteel have been compelled to incur and/or otherwise pay over $25 million in Past Response Costs at the Fansteel Site.

230.     FMRI, itself and as assignee of Fansteel, is entitled to contribution from the Port under Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), for the Port's respective equitable share of the Total Response Costs and damages incurred by FMRI and Fansteel, including applicable interest as provided for in Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

**WHEREFORE**, FMRI, Inc., on its own behalf and as assignee of Fansteel, Inc., respectfully requests that this Court enter a judgment in its favor and against the Port finding that it is liable under CERCLA and is obligated to pay for its equitable share of the Total Response Costs, including appropriate pre-judgment interest, associated with the Fansteel Site. FMRI further requests that this Court award interest and costs of suit, including reasonable attorney's fees and consultant fees as permitted by law; and order any such other relief as the Court may deem just and appropriate under the circumstances.

## COUNT III

### DECLARATORY RELIEF UNDER CERCLA
### AGAINST THE OWNER DEFENDANT

231.     Plaintiff realleges and incorporates by reference Paragraph No. 1 through Paragraph No. 208 of this Complaint, as if fully restated herein.

232.     There is a present and actual controversy between FMRI and the Port concerning their respective rights and obligations with respect to the Total Response Costs associated with the Fansteel Site.

233.     Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), provides, in relevant part, that:

> In any such action described in this subsection, the court shall enter a

> declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages. A subsequent action or actions under section 9607 of this title for further response costs at the vessel or facility may be maintained at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response action. Except as otherwise provided in this paragraph, an action may be commenced under section 9607 of this title for recovery of costs at any time after such costs have been incurred.

234.   FMRI seeks a declaratory judgment under Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), against the Port, holding it liable for its respective equitable share of response costs, that will be binding in any subsequent action to recover further response costs.

235.   FMRI, on its own behalf and as assignee of Fansteel, is entitled to judgment against the Port for the Total Response Costs incurred and to be incurred in connection with the Fansteel Site, and the Port does not qualify for the third-party CERCLA defense set forth in Section 107(b)(3) and Section 101(35), 42 U.S.C. § 9607(b)(3) and § 9601(35), as alleged more fully in Section III. B. above.

**WHEREFORE**, FMRI, Inc., on its own behalf and as assignee of Fansteel, Inc., respectfully requests that this Court enter a declaratory judgment against the Port finding that it is liable under CERCLA and is obligated to pay for its equitable share of the Total Response Costs associated with the Fansteel Site. FMRI further requests that this Court award interest and costs of suit, including reasonable attorney's fees and consultant fees as permitted by law; and order any such relief as the Court may deem just and appropriate under the circumstances.

## COUNT IV

## COST RECOVERY UNDER CERCLA
## AGAINST THE VENDOR DEFENDANTS

236.  Plaintiff realleges and incorporates by reference Paragraph No. 1 through Paragraph No. 208 of this Complaint, as if fully restated herein.

237.  Section 107(a)(3) of CERCLA, 42 U.S.C. §§ 9607(a)(3), provides, in relevant part, that:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section --
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances,....
>
> shall be liable for—
> (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;
> (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;
> (C) damages for injury to, destruction of, or loss of natural resources including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and
> (D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

238.  "Disposal" is defined in CERCLA Section 101(29) by reference to the Solid Waste Disposal Act ("SWDA"). 42 U.S.C. § 9601(29). The SWDA defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

239.     The term "treatment," when used in connection with hazardous waste, means any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage, or reduced in volume.

240.     The term "treatment" includes any activity or processing designed to change the physical form or chemical composition of hazardous waste so as to render it nonhazardous.

241.     "Facility" is defined in CERCLA Section 101(9) as "any building, structure, installation, equipment, pipe or pipeline" or "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed...." 42 U.S.C. § 9601(9).

242.     "Hazardous substance" is defined in CERCLA Section 101(14) by reference to other federal statutes and by reference to a list of substances published by EPA at 40 C.F.R. § 302.4. 42 U.S.C. § 9601(14).

243.     "Person" is defined in CERCLA Section 101(21) as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(20).

244.     "Release" is defined in CERCLA Section 101(22) as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant) ...." 42 U.S.C. § 9601(22).

245.    "Response" is defined in CERCLA Section 101(25), and includes "removal" actions, "remedial" actions, and enforcement activities related thereto. 42 U.S.C. § 9601(25).

246.    The Fansteel Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

247.    There has been a "release" and/or a threatened "release" of "hazardous substances" at the Fansteel Site which has caused the incurrence of "response costs" by the Fansteel and FMRI, within the meanings of Sections 101(22), 101(14) and 107 of CERCLA, 42 U.S.C. §§ 9601(22), 9601(14) and 9607.

248.    FMRI is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

249.    Fansteel is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

250.    As alleged above, each Vendor Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

251.    Pursuant to CERCLA, 42 U.S.C. §§ 9607(a)(3) each Vendor Defendant is liable as an arranger or generator of materials containing hazardous substances, which materials have been released, after being treated and disposed of by Fansteel, and which constitute an ongoing threatened release by remaining in, on or at the Fansteel Site.

252.    As a result of the release and threatened release of hazardous substances at or from the Fansteel Site, FMRI and Fansteel have incurred response costs and will continue to incur costs of "response," as that term is defined by Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).

253.    The Total Response Costs incurred and to be incurred by FMRI and Fansteel in connection with the Fansteel Site are consistent with the National Contingency Plan.

254.     Pursuant to CERCLA Section 107, 42 U.S.C. §§ 9607, each Vendor Defendant is strictly, jointly and severally liable for the Total Response Costs incurred and to be incurred by FMRI and Fansteel in response to the release or threatened release of hazardous substances at and from the Fansteel Site.

**WHEREFORE**, FMRI, Inc., on its own behalf and as assignee of Fansteel, Inc., respectfully requests that this Court enter a judgment in its favor and against all Vendor Defendants holding that each Vendor Defendant is strictly, jointly and severally liable for the Total Response Costs incurred and to be incurred by FMRI and Fansteel, including appropriate pre-judgment interest, in connection with the release and/or threatened release of hazardous substances in, on or at the Fansteel Site. FMRI further requests that this Court award interest and costs of suit, including reasonable attorney's fees and consultant fees as permitted by law; and order any such other relief as the Court may deem just and appropriate under the circumstances.

### COUNT V

### CONTRIBUTION UNDER CERCLA AGAINST THE VENDOR DEFENDANTS

255.     Plaintiff realleges and incorporates by reference Paragraph No. 1 through Paragraph No. 208 of this Complaint, as if fully restated herein.

256.     Sections 113(f)(1) and (3)(B) of CERCLA, 42 U.S.C. §§ 9613(f)(1) and (3)(B), provide, in relevant part, that:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a)....
>
> A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement....

257.   FMRI and Fansteel have resolved their liability to EPA for matters covered in the ESA.

258.   All Vendor Defendants are liable parties under CERCLA, but have not resolved their liability to FMRI, Fansteel or the EPA.

259.   To date, FMRI and Fansteel have been compelled to incur and/or otherwise pay over $25 million in response costs at the Fansteel Site.

260.   FMRI and Fansteel are entitled to contribution from all Vendor Defendants under Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), for Vendor Defendants' respective equitable shares of the Total Response Costs and damages incurred by FMRI and Fansteel, including applicable interest as provided for in Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

**WHEREFORE**, FMRI, Inc., on its own behalf and as assignee of Fansteel, Inc., respectfully requests that this Court enter a judgment in its favor and against all Vendor Defendants finding that they are each liable under CERCLA and are obligated to pay for their equitable shares of the Total Response Costs, including appropriate pre-judgment interest, associated with the Fansteel Site. FMRI further requests that this Court award interest and costs of suit, including reasonable attorney's fees and consultant fees as permitted by law; and order any such other relief as the Court may deem just and appropriate under the circumstances.

**COUNT VI**

**DECLARATORY RELIEF UNDER CERCLA**
**<u>AGAINST THE VENDOR DEFENDANTS</u>**

261.   Plaintiff realleges and incorporates by reference Paragraph No. 1 through Paragraph No. 208 of this Complaint, as if fully restated herein.

262.   There is a present and actual controversy between FMRI and all Vendor Defendants concerning their respective rights and obligations with respect to the response costs associated

with the Fansteel Site.

263.    Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), provides, in relevant part, that:

> In any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages. A subsequent action or actions under section 9607 of this title for further response costs at the vessel or facility may be maintained at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response action. Except as otherwise provided in this paragraph, an action may be commenced under section 9607 of this title for recovery of costs at any time after such costs have been incurred.

264.    FMRI seeks a declaratory judgment under Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), against all Vendor Defendants holding each of them liable for their respective equitable shares of response costs, that will be binding in any subsequent action to recover further response costs.

265.    FMRI, on its own behalf and as assignee of Fansteel, is entitled to judgment against all Vendor Defendants for past and future response costs incurred in connection with the Fansteel Site.

**WHEREFORE**, FMRI, Inc., on its own behalf and as assignee of Fansteel, Inc., respectfully requests that this Court enter a declaratory judgment against all Vendor Defendants finding that they are each liable under CERCLA and are obligated to pay for their equitable shares of the Total Response Costs associated with the Fansteel Site. FMRI further requests that this Court award interest and costs of suit, including reasonable attorney's fees and consultant fees as permitted by law; and order any such relief as the Court may deem just and appropriate under the circumstances.

Dated April 1, 2021                    Respectfully Submitted,

                                       FMRI, INC.

                                       Plaintiff,

                                       By: _____

                                       Christopher R. Ward, Esq. (32300)
                                       (cward@clarkhill.com)
                                       CLARK HILL | STRASBURGER
                                       2600 Dallas Parkway
                                       Suite 600
                                       Frisco, Texas 75034
                                       Phone: (214) 651-4722
                                       Facsimile: (214) 659-4108

                                       Eric Dorkin, Esq. *(Motion for Admission Pro Hac Vice to be Filed)*
                                       (edorkin@clarkhill.com)
                                       Jeffrey M. Sniadanko, Esq. *(Motion for Admission Pro Hac Vice to be Filed)*
                                       (jsniadanko@clarkhill.com)
                                       CLARK HILL PLC
                                       130 East Randolph Street
                                       Suite 3900
                                       Chicago, IL  60601
                                       Phone: (312) 985-5523 (Sniadanko)
                                       Facsimile: (312) 985-5966 (Sniadanko)