IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **FANSTEEL METALS, INC., F/K/A FMRI, INC.,**<br><br>*Plaintiff*,<br><br>v.<br><br>**MUSKOGEE CITY-COUNTY PORT AUTHORITY,** *et al.*,<br><br>*Defendants.* | Case No. 21-CV-102-RAW |

## ORDER

This matter comes before the court on the Partial Motion to Dismiss filed by the Muskogee City-County Port Authority [Dkt. No. 149]. For the reasons set forth below, the court grants this motion.

## BACKGROUND

This case involves claims asserted pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") regarding the operation of a metal processing and treatment facility. In the context of considering the present motions, the court accepts as true the well-pled factual allegations from the Second Amended Complaint [Dkt. No. 89]. *See Butler v. Bd. of Cty. Commissioners for San Miguel Cty.*, 920 F.3d 651, 654 (10th Cir. 2019).

Beginning in 1957, Plaintiff Fansteel Metals, Inc., f/k/a FMRI ("Fansteel") operated a facility in Muskogee County, Oklahoma ("Fansteel Site"). Operations at the Fansteel Site involved the processing of raw materials which generated residual waste. This residual waste, containing radiological and hazardous substances, was disposed of in onsite treatment ponds. Over the years,

several significant releases from these ponds occurred, impacting nearby groundwater and soil. Operations at the Fansteel Site ultimately ceased in approximately 1990. Then in 1999, the Muskogee City-County Port Authority ("Port") purchased one parcel of the Fansteel Site consisting of approximately twenty acres. In 2006, a chlorinated groundwater plume was discovered underneath the Port's parcel.

In the period after operations at the Fansteel Site ceased, Fansteel has twice filed for bankruptcy protection and entered into a number of agreements with the Nuclear Regulatory Commission, the Department of Justice, and the Oklahoma Department of Environmental Quality ("ODEQ"). Relevant here, in Fansteel's 2016 bankruptcy proceeding,[1] it entered into a judicially approved Environmental Settlement Agreement ("ESA") with the United States and the ODEQ. *See* Dkt. No. 149–1. Pursuant to the ESA, Fansteel "resolved liability to the United States and ODEQ within the meaning of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2)[.]" Under the ESA, Fansteel is "entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for the 'matters addressed' in this Settlement Agreement."[2]

Fansteel subsequently brought this action, asserting three counts against the Port: (1) cost recovery pursuant to 42 U.S.C. § 9607(a); (2) contribution pursuant to 42 U.S.C. § 9613(f); and (3) declaratory judgment pursuant to 42 U.S.C. § 9613(g). The Port has moved to dismiss Count One, arguing Fansteel is precluded from seeking cost recovery after resolving its liabilities in the ESA.

---

[1] United States Bankruptcy Court Southern District of Iowa, Case No. 16-01823-ALS11.

[2] When evaluating a motion to dismiss, the court may consider the complaint itself, exhibits attached to the complaint, and "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). The ESA was referred to repeatedly in the complaint, forms the basis of Fansteel's contribution claims, and the parties do not dispute its authenticity.

**LEGAL STANDARD**

When addressing a Rule 12(b)(6) motion to dismiss, the court does not weigh the evidence the parties might present at trial but instead assesses whether the plaintiff's complaint is legally sufficient to state a claim for which relief may be granted. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1135 (10th Cir. 2014). A complaint is legally sufficient when it contains enough "facts to state a claim to relief that is plausible on its face," and the factual allegations are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A well-pled complaint may survive a motion to dismiss "even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id*. In assessing a claim's plausibility, the court must accept all well-pled facts as true and view them in the light most favorable to the claimant. *Brokers' Choice*, 757 F.3d at 1165. The court is not bound, however, to accept an allegation as true when it amounts to no more than a conclusory statement. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**ANALYSIS**

Pursuant to the ESA, Fansteel resolved its liability to the United States and the ODEQ. The Port argues this settlement agreement prevents Fansteel from filing a cost recovery action. The resolution of this issue turns on the interplay between cost recovery and contribution claims.

**I.   Cost recovery and Contribution.**

CERCLA grants private litigants two distinct causes of action: cost recovery under 42 U.S.C. § 9607(a) and contribution under 42 U.S.C. § 9613(f). They are "similar and somewhat overlapping remed[ies]." *Key Tronic Corp. v. United States*, 511 U.S. 809, 816 (1994). Pursuant to § 9607(a), a person who incurs necessary response costs in remediating a contaminated site may sue those parties potentially responsible for the pollution. Where a plaintiff succeeds in a cost recovery action, the defendants are held jointly and severally liable. *Cranbury Brick Yard, LLC v.*

*United States*, 943 F.3d 701, 704 (3d Cir. 2019). Pursuant to § 9613(f), conversely, "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a)[.]" Contribution under CERCLA is equivalent to traditional contribution at common law and is defined as "the tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determined as a percentage of fault." *United States v. Atlantic Research Corp.*, 551 U.S. 128, 138 (2007). Where a plaintiff succeeds in a contribution action, "the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). Relevant here, a party which settles its liabilities with governmental authorities receives immunity from contribution claims: "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2).

In *Atlantic Research Corp.*, the Court held that at least in certain scenarios, either cost recovery or contribution may be available to a party. 551 U.S. at 141. Since then, the contours of the relationship between the two remedies have been litigated. Every circuit court to address the present issue has held that a party who settles its CERCLA liability with a state or federal government, thereby obtaining immunity from contribution claims, is limited to bringing contribution claims and cannot bring cost recovery claims. *See, e.g., Cranbury Brick Yard, LLC*, 943 F.3d at 705.[3] This rule prevents a settling polluter "from using [its] immunity as both sword and shield." *Id*. Imagine a routine CERCLA action: Company A and Company B both pollute land owned by the State and each are 50% responsible. The State cleans up the site and then files a cost

---

[3] *See also Whittaker Corp. v. United States*, 825 F.3d 1002, 1007 & n.4 (9th Cir. 2016); *Hobart Corp. v. Waste Mgmt. of Ohio, Inc.*, 758 F.3d 757, 768 (6th Cir. 2014); *Bernstein v. Bankert*, 733 F.3d 190, 202 (7th Cir. 2013); *Solutia, Inc. v. McWane, Inc.*, 672 F.3d 1230, 1236–37 (11th Cir. 2012) (per curiam); *Morrison Enters. v. Dravo Corp.*, 638 F.3d 594, 603 (8th Cir. 2011); *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 127–28 (2d Cir. 2010).

recovery action against both companies. Each would be jointly and severally liable for 100% of the clean-up costs, but could file a crossclaim for contribution, asking the court to equitably apportion the damages at 50% for each company. Now instead imagine a different scenario: Company A and Company B both pollute land owned by the State and each are 50% responsible. The State cleans up the site and seeks to settle with the parties. Company A settles with the State for 40% of the total costs, and Company B does not settle. Company A could then file a cost recovery action against Company B for the full amount of its settlement, impose joint and several liability, and recoup the funds it paid to the State. Unlike in the first scenario, Company B could not counterclaim for contribution because Company A received contribution immunity after the settlement. Thus, Company A would ultimately be able to avoid financial responsibility for its pollution.

Because of this second scenario, "every Circuit Court of Appeals to consider the intersection of §§ 107(a) and 113(f) has concluded that if a party seeks recovery of costs incurred due to an administrative or judicially approved settlement, it must do so under § 113(f), not under § 107(a)." *Stratus Redtail Ranch LLC v. Int'l Bus. Machines Corp.*, 2020 WL 6119864, at *6 (D. Colo. Mar. 24, 2020). Although the Tenth Circuit has not ruled on this issue, district courts within the Tenth Circuit have adopted the approach taken by the other circuits. *See id.; Cyprus Amax Mins. Co. v. TCI Pac. Commc'ns, Inc.,* 2013 WL 6238485, at *5 (N.D. Okla. Dec. 3, 2013). This court adopts that approach as well.

Thus, Fansteel is barred from recovering costs for which it has resolved its liability to the United States and the ODEQ in the ESA. Fansteel additionally argues, however, that the costs it seeks to recover in this action are, in part, distinct from those addressed in the ESA. Because these alleged additional costs were not addressed in the ESA, so the argument goes, Fansteel does not

have contribution immunity against those costs and may seek to recuperate them in a cost recovery proceeding.

Certain circuit courts have held that "even where one of the statutory triggers for a contribution claim has occurred for certain expenses at a site, a party may still bring a cost recovery action for its other expenses." *See e.g., Whittaker Corp. v. United States*, 825 F.3d 1002, 1009 (9th Cir. 2016). Put another way, "a party's right to contribution for some of its expenses at a site does not necessarily mean that the party loses its right to bring a cost recovery action for other expenses." *Id*. Consequently, if Fansteel incurred costs in remediating the Fansteel Site that were not addressed by the ESA, it could potentially recover those costs in an action under § 9607(a). *See Chevron Mining, Inc. v. United State*s, 2015 WL 13650031, at *10 (D.N.M. Mar. 31, 2015) ("Plaintiff's § 107(a) claim is dismissed only insofar as it seeks to recover costs for 'matters addressed' in the March 2012 and September 2012 Settlement Agreements."). The key issue, then, is whether the response costs Fansteel seeks in the Second Amended Complaint were addressed in the ESA.

Fansteel seeks three categories of damages: (1) "past response costs," which are previously incurred costs to perform required response activities at the Fansteel Site; (2) "additional response costs," which are costs for administrative functions closely tied to the response activities; and (3) "future response costs," which are costs to be incurred to perform required response activities. The past response costs, additional response costs, and future response costs are defined as the "Total Response Costs" and "constitute all of the response costs that Fansteel and FMRI have incurred or will incur in connection with the investigation and remediation of the Fansteel Site." *See* Dkt. No 89, ¶ 55. In the prayer for relief in Count One, Fansteel seeks a judgment in its favor for the Total Response Costs.

The ESA granted Fansteel protection from contribution claims for the "matters addressed" therein. *See* Dkt. No. 149–1, ¶ 22. And the "matters addressed" were expressly delineated:

> The "matters addressed" in this Settlement Agreement are all Maintenance Activities, Decommissioning Activities and Environmental Activities including all response actions taken or to be taken, and all response costs incurred or to be incurred, at or in connection with Existing Contamination at Muskogee Property by the United States or any potentially responsible parties[.]

*Id*. The phrases "Maintenance Activities," "Decommissioning Activities," "Environmental Activities," and "Existing Contamination" are further defined:

> "Maintenance Activities" means any and all activities other than Decommissioning Activities that are necessary to ensure the adequate protection of public health and safety with respect to the Muskogee Property, including, but not limited to, securing licensed materials, water treatment and monitoring, airborne particulate and effluent monitoring, radon monitoring, personnel exposure monitoring, contamination monitoring, and the implementation and maintenance of engineered structures and controls to prevent the release of radiological and nonradiological hazardous materials from the Muskogee Property or the ponds which contain process waste exceeding regulatory release criteria.
> ***
> "Decommissioning Activities" shall mean those activities that reduce the residual radioactivity to a level such that the NRC may terminate the Muskogee License and release the Muskogee Property for unrestricted use or terminate the Muskogee License and release the Muskogee Property under restricted conditions or use.
> ***
> "Environmental Activities" shall mean any and all environmental activities authorized or required under Environmental Laws that occur after the Effective Date and that are related to the Muskogee Property, including but not limited to response or remedial actions, removal actions, corrective action, closure, or post-closure care, reclamation, investigations, studies, remediation, interim actions, final actions, emergency actions, water treatment, implementation of engineered structures and controls, monitoring, repair and replacement of engineered structures, monitoring equipment and controls, operation and maintenance, implementation, operation and maintenance of institutional controls, coordination and integration of reuse and remedial efforts and initiatives (including, without limitation, multi-stakeholder communications), and, if required, long-term stewardship and perpetual custodial care activities. "Environmental Activities" also include the above environmental activities relating to the migration of hazardous substances emanating from the Muskogee Property. For the avoidance of doubt, "Environmental Activities" shall not include natural resource assessment or restoration.
> ***

> "Existing Contamination" means (a) any hazardous substances, pollutants or contaminants present or existing on or under the Muskogee Property as of the Effective Date; (b) any hazardous substances, pollutants or contaminants that migrated from the Muskogee Property prior to the Effective Date; and/or (c) any hazardous substances, pollutants, or contaminants presently at the Muskogee Property that migrate from the Muskogee Property after the Effective Date.

*Id.*, at 4–5, 16–17. Reading these provisions together, the "matters addressed" in the ESA are a wide array of actions and activities related to remediation of the Fansteel Site. Several specific actions and activities are identified, but most significantly, the ESA broadly addresses "all response actions taken or to be taken, and all response costs incurred or to be incurred, at or in connection with" contamination at the Fansteel Site. *Id.*, ¶ 22.

The damages Fansteel seeks are "all of the response costs that Fansteel and FMRI have incurred or will incur in connection with the investigation and remediation of the Fansteel Site." *See* Dkt. No 89, ¶ 55. And the ESA addresses "all response actions taken or to be taken, and all response costs incurred or to be incurred, at or in connection with" contamination at the Fansteel Site. *See* Dkt. No. 149–1, ¶ 22. Based on the plain language of the ESA, therefore, the costs Fansteel seeks to recover in this action are not distinct from those matters addressed in the ESA. Consequently, Fansteel is precluded from recovering those costs.

Fansteel seeks to counter the foregoing by identifying two specific categories of response costs purportedly not covered by the ESA. The first category consists of Environmental Activities incurred prior to the effective date of the bankruptcy court's order approving the ESA. Recall that "Environmental Activities" are defined as "any and all environmental activities authorized or required under Environmental Laws that occur after the Effective Date . . . including but not limited to response or remedial actions, removal actions, corrective action . . . ." Fansteel argues that because only Environmental Activities that occur after the Effective Date (June 2, 2020) are specified, environmental activities that occurred *prior* to the Effective Date are not addressed in

8

the ESA. This argument, however, improperly focuses only on the definition of "Environmental Activities" and ignores the broad catch-all language in the ESA, which covers "all response actions taken or to be taken, and all response costs incurred or to be incurred, at or in connection with" contamination at the Fansteel Site. Environmental response actions, remedial actions, and removal actions that occurred prior to the Effective Date are still "response actions taken," and are therefore covered by the ESA.

The second category of response costs purportedly not covered by the ESA are "costs incurred for PRP search costs and costs to perform administrative functions that are closely tied to Maintenance Activities, Decommissioning Activities, and Environmental Activities." Again, however, these costs are covered by the broad language in the ESA. Fansteel has presented no cogent argument that response costs related to "administrative functions" are somehow distinct from "all response actions taken or to be taken, and all response costs incurred or to be incurred."

The response costs Fansteel seeks in the Second Amended Complaint were addressed in the ESA, and Fansteel consequently has contribution immunity against the costs. It, therefore, is precluded from seeking to recover those costs in an action instituted under 42 U.S.C. § 9607(a). Count One of the Second Amended Complaint is thus dismissed.

Lastly, Fansteel seeks leave to clarify the relief it seeks in Count One. This action has been pending for well over a year, and given the broad language in the ESA, it is not clear Fansteel could allege response costs it incurred that are somehow distinct from "all response actions taken or to be taken, and all response costs incurred or to be incurred." Fansteel's request to file a fourth complaint is denied.

## II. Fansteel's Motion to Accelerate Deadlines.

After the Port filed its Partial Motion to Dismiss, Fansteel moved the court for entry of an order requiring the Port to file a responsive pleading to Count Two of the Second Amended Complaint [Dkt. No. 154]. Having resolved the Partial Motion to Dismiss, Fansteel's Motion to Accelerate Deadlines is moot and, therefore, denied. Pursuant to Fed. R. Civ. P. 12(a)(4), the Port must file its responsive pleading within fourteen days of the entry of this Order.

## CONCLUSION

For the reasons set forth above, the Partial Motion to Dismiss filed by Defendant Muskogee City-County Port Authority [Dkt. No. 149] is **GRANTED**. Count One of the Second Amended Complaint [Dkt. No. 89] is hereby dismissed.

In addition, Fansteel's Motion to Accelerate Deadlines [Dkt. No. 154] is **DENIED**. The Port must file its responsive pleading within fourteen days of the entry of this Order.

**IT IS SO ORDERED** this 29th day of July, 2022.

_____
**THE HONORABLE RONALD A. WHITE
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF OKLAHOMA**